IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JODY OSEMAN-DEAN,            )
                             )
              Plaintiff,     )
                             ) Civil Action No.: 11 C 1935
       v.                    )
                             ) Suzanne B. Conlon, Judge
ILLINOIS STATE POLICE et al.,)
                             )
              Defendants.    )
                             )
                             )

## MEMORANDUM OPINION AND ORDER

In 2009, Jody Oseman-Dean, now retired, was a 24-year veteran of the Illinois State Police ("ISP"). She had spent nearly her entire career in District 5, a patrol district, and had risen through the ranks to become a lieutenant and the second in command of the district. Once she was acting commander of the district for eight months. When the District 5 Commander announced his retirement, he supported Oseman as his successor. She and one other candidate applied for the vacancy. When the other candidate, a man, was chosen, she suspected gender discrimination. The male candidate had spent the bulk of his career doing investigations, not patrol, and, in Oseman's view, was less qualified for the position. Oseman filed a complaint with ISP's Office of Equal Employment Opportunity ("EEO office"), and later with the Illinois Department of Human Rights. After she did not receive relief, she filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. She alleges she was passed over for promotion because of her gender and then retaliated against for complaining. Defendants move for summary judgment. They contend the male applicant was the better

1

candidate, in part because of his experience outside of patrol. They deny Oseman suffered any retaliation.

## I. Background[1]

Lt. Oseman joined the ISP in 1984.[2] Def. Facts ¶¶ 4, 25. She spent the majority of her career in District 5. *Id.* ¶ 25. District 5 is located in Region II, which is comprised of several districts and zones. *Id.* ¶ 8. Districts are responsible for patrol in a specific geographic area, while zones have investigatory duties. *Id.* ¶ 9. Region II, in turn, is one of four regions within the Division of Operations. *Id.* ¶ 8. The Division of Operations, along with the Division of Administration, the Division of Forensic Services, and the Division of Internal Investigations, make up the ISP. *Id.* ¶ 6.

Lt. Oseman spent her entire career in patrol except for a nine-month temporary assignment in investigations. Def. Facts ¶ 25. By 2000, she was promoted to master sergeant in District 5, putting her in charge of a platoon. Pl. Resp. to Def. Facts ¶ 25; Pl. Ex. 2 at 12. In 2002, she served as District 5's administrative officer, overseeing logistical matters such as septic

---

[1] These facts are from the parties' Local Rule 56.1 statements. When a fact is undisputed, the statement of fact is cited. When a fact is disputed, the court looks to the record evidence cited to resolve the dispute. All disputes supported by the record are resolved in Oseman's favor, and she receives the benefit of all reasonable inferences. *Brooks v. City of Aurora*, 653 F.3d 478, 483 (7th Cir. 2011). Facts not properly disputed with citation to the record are deemed admitted. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009). In addition, the court relied on ISP's website for assistance in determining ISP's organizational structure. *See* ISP Department Organization, http://www.isp.state.il.us/aboutisp/deptorg.cfm, *and* ISP Division of Operations (DOO), http://www.isp.state.il.us/aboutisp/deptorg_doo.cfm (last visited April 12, 2012).

[2] All the individuals in this case are members of the ISP and may have held different ranks and positions through the relevant time period. The court uses whichever title was applicable at the time the facts occurred.

tanks, bathrooms, and telephones; ensuring officers had proper training; and occasionally handling correspondence for the District 5 Commander. Pl. Resp. to Def. Facts ¶ 25; Pl. Ex. 2 at 15–16. Toward the end of 2003, Oseman became the acting operations officer for District 5. Pl. Resp. to Def. Facts ¶ 25; Pl. Ex. 2 at 16. As the acting operations officer, she ran the day-to-day operations of the district: ensuring the schedules for each day were properly staffed, ensuring activity was what it should be, and overseeing reports. Pl. Ex. 2 at 16. In 2005, that position became permanent after Oseman was promoted to lieutenant. Def. Facts ¶ 25. As operations lieutenant, she was solely in charge of the day-to-day operations of the district, answering to the District 5 Commander. Pl. Ex. 2 at 15. The District 5 Commander to whom she reported from 2005 until his retirement in 2009 was Capt. Kenneth Kaupas. *Id.* ¶ 20; Pl. Ex. 2 at 17. While serving as District 5's operations lieutenant, she took over Kaupas' duties as District 5 Commander for eight months while he was occupied with the Stacey Peterson investigation. Pl. Facts ¶ 2; Pl. Ex. 24 at ¶¶ 8–10. Kaupas believed she did an "exceptional job," and Lt. Col. Marc Maton (then Region II Commander) said she did an "okay job." Pl. Ex. 24 at ¶ 10; Pl. Ex. 10 at 101.

When Capt. Kaupas announced his planned retirement, it opened up a vacancy for District 5 Commander. He expressed to Lt. Col. Maton (the then-Region II Commander and first level-supervisor over the District 5 Commander) his support for Lt. Oseman to fill the position. Pl. Facts ¶ 13. Maton told him that he would not support Oseman for promotion because at times he found her unprofessional, mentioning a 2008 incident about an email (discussed below).[3] *Id.*

---

[3] Defendants do not contest Kaupas made these statements, but they contest that the truth of the statements is supported by evidence in the record. They do not provide record cites to back this up. Pl. Resp. to Def. Facts ¶ 13. However, defendants correctly note that neither

3

Kaupas believed Maton was overly critical of Oseman. *Id.*

To fill the soon-to-be vacant position, Lt. Col. Maton asked two male officers if they wanted to lateral into the District 5 Commander position. Pl. Facts ¶ 3. They declined, and the position was posted, opening it up for applicants. *Id.*; Def. Facts ¶ 21. Applicants had to be either ranked captain or ranked lieutenant and certified for promotion to captain. Def. Facts ¶ 21. The lieutenants certified for promotion are determined by a certification process conducted by the Illinois State Police Merit Board. *Id.* ¶ 11. Four elements go into the certification process to obtain an overall score: a performance evaluation score, an assessment center score, a written test score, and seniority points. *Id.*; Pl. Resp. to Def. Facts ¶ 11. The top 65% of applicants are certified for promotion and placed on a promotion certification list. Def. Facts ¶¶ 12, 22. The top ten individuals are deemed equally qualified for promotion and are not ranked numerically. *Id.* ¶ 12. The remaining certified candidates are ranked by overall scores. *Id.* When a captain's position is posted, all lieutenants on the captain certification list may apply, but only those in the top ten are eligible to proceed to the interview process. *Id.* ¶ 15; Def. Ex. Z at 58–59. An applicant who did not initially place in the top ten may still be eligible for the position; individuals may move up on the list as those ahead of them are promoted or disclaim interest in a particular vacancy. Def. Facts ¶ 13.

Only two people applied for the District 5 Commander vacancy, Lt. Oseman and Lt. Michael Cooke. Def. Facts ¶¶ 22, 24. Oseman had placed in the unranked top ten on the

---

Kaupas nor Maton had a role in ultimately selecting which of the two candidates to promote. Pl. Ex. 10 at 184 (defendants cite p. 187, but the court assumes that was a typo); Pl. Ex. 24 at ¶ 12. Nevertheless, this information is helpful background information for the promotion process. Maton's lack of involvement in the selection decision makes his continued presence in this lawsuit perplexing.

2008 Promotion Certification List for Captain. *Id.* ¶ 22. Cooke was ranked 14, but by the time of the vacancy, five higher-ranked individuals were promoted, allowing Cooke to move into the top ten and become eligible for the position. Pl. Resp. to Def. Facts ¶ 22; Pl. Ex. 8; Def. Facts ¶ 23.

Lt. Cooke joined the ISP in 1986. Pl. Resp. to Def. Facts ¶ 26. He spent three years in patrol before moving to investigations. Def. Facts ¶ 26. He remained in investigations until the promotion to District 5 Commander at issue. *Id.* During his career, he has worked for the DuPage undercover drug unit, formed ISP's fugitive apprehension team, served on the public integrity force, supervised the Cook County Metropolitan Enforcement group (narcotics), and formed the covert operations unit. *Id.* He rose through the ranks to become a lieutenant in 2005 in the crime unit in Zone 1, located in Region I. *Id.*

Lt. Oseman and Lt. Cooke proceeded to the interview stage of the promotion process. Def. Facts ¶ 24. The promotion process is governed by the Illinois State Police Sworn Employee Interview and Selection Procedures, instituted in 2008. *Id.* ¶ 10. The 2008 written promotion procedures separate the interview and selection processes to make it more fair and equitable. Pl. Facts ¶ 4. The interview questions are drafted in advance, and an interview panel diverse in gender, ethnic background, and geographical location is formed. Def. Facts ¶ 16. The first-level supervisor over the vacant position is part of the interview panel but is not supposed to take part in the decision process for selecting a candidate.[4] Pl. Facts ¶ 4; Pl. Ex. 6 at 29. It would be

---

[4] Defendants dispute Oseman's cited evidence supports the proposition that under the written promotion procedures, the first-level supervisor sits on the interview panel but has no role in the selection process. Def. Resp. to Pl. Facts ¶ 4. ISP's 30(b)(6) witness testified:

> Q. And in what way does [having two separate processes for interview and

5

unusual for the second-level supervisor over the vacant position to sit on the interview panel. Pl. Facts ¶ 5.

The interview panel for the District 5 Commander vacancy consisted of Lt. Col. Robert Haley, Lt. Col. Marc Maton, Lt. Col. Delia Diamond, Lt. Col. Patrick Keen, and Capt. Suzanne Jansky. Def. Facts ¶ 27. Haley was the Region II Commander, the first-level supervisor over the vacancy; he replaced Maton as Region II Commander in June 2009, the month of the interviews. Pl. Facts ¶¶ 1, 5. Maton had been promoted to Lieutenant Colonel of Operations, overseeing the operations of all four regions within the Division of Operations. Def. Facts ¶¶ 7–8. Diamond was the Lieutenant Colonel for Personnel, overseeing personnel issues for the Division of Operations. *Id.* Keen was the Executive Officer for the Division of Operations, the second-level

---

selection] make it more fair and equitable?

> A. Well, often, when the interview panels are set up for the interview, the immediate supervisor of the vacancy will be part of the interview panel. This takes the – this process takes that person out of the decision process for selection and moves it up to the next highest level.
>
> Q. So just to clarify, part of what makes it more fair is the immediate supervisor of the opening is on the interview panel but the selection is made by the person two ranks up?
>
> A. Above the open vacant position, yes.

Pl. Ex. 6 at 29. The witness later reiterated: "[Y]our interview panel is not making the selection. The selection is made above that level." *Id.* at 75. The 2008 written promotion procedures state: "[T]he Interview and Selection Processes are <u>two separate</u> processes. This Interview Process is not intended to be used as the sole determinate for filling a posted position – it is to be used to narrow the applicant pool to the top candidates. Those candidates will move on to the 'Selection Process.'" Pl. Ex. 7 at 1 (emphasis in original). Defendants' dispute is baseless.

6

supervisor over the vacancy.[5] *Id.* ¶ 7; Pl. Facts ¶ 5. Jansky was the District 6 Commander, a district in Region III. Def. Facts ¶ 27; Def. Ex. I at 3. Defendants do not explain why Keen, the vacancy's second-level supervisor, sat on the interview panel in contravention of the written promotion procedures.

The pre-drafted interview questions were distributed to the panel at the time of the interviews in June 2009. Def. Facts ¶ 28. The panelists took notes during the interviews on their copies of the questions. *Id.* However, ISP could not locate the panelists' notes for this litigation, even though the interview notes were required to be attached to the final interview recommendation packet and preserved a minimum of thee years. *Id.* ¶ 30; Pl. Facts ¶ 40. Therefore, the actual interview questions and the panelists' contemporaneous impressions are unavailable. Instead, the panel members were deposed about their recollections of the interviews.[6] Def. Facts ¶ 30.

---

[5] The parties' statements of fact are not entirely clear about Keen's role in the ISP and who reported to whom. As best as the court can tell, region commanders, Maton, and Diamond (as well as the Lieutenant Colonel of Logistics, who is not involved in this suit) reported to Keen. Pl. Resp. to Def. Facts ¶ 7; Pl. Ex. 3 at 7–8; Pl. Ex. 5 at 33–34. Keen is the direct supervisor over the region commanders, but if a region commander has a logistics issue, for example, he or she is supposed to go to the Lieutenant Colonel of Logistics. Pl. Ex. 5 at 34. The Lieutenant Colonels of Logistics, Operations, and Personnel have no direct supervisory authority over the region commanders. *Id.* Although the Lieutenant Colonels of Logistics, Operations, and Personnel report to the Executive Officer, Pl. Ex. 3 at 7–8, it is unclear whether the Executive Officer has supervisory authority over them. The Executive Officer reports to the Deputy Director of the Division of Operations, Col. Harold Nelson; everything that happened in the Division of Operations funneled through Keen to Nelson. *Id.*; Def. Facts ¶ 7.

[6] Oseman suggests that an adverse inference should be drawn against ISP for its failure to produce the interview notes. But this suggestion is so conclusory, the court declines to do so. Oseman does not cite the governing law about missing documents, nor does she provide ISP's purported reasons for the record retention violation or argue those reasons show bad faith. Only bad faith violations of record retention policies support adverse inferences. *Park v. City of Chicago*, 297 F.3d 606, 615 (7th Cir. 2002). Given the contentiousness of discovery in this case,

7

Lt. Oseman recalled that the interview questions were related to the expectations of the position and how she would do certain things as a supervisor. Def. Facts ¶ 78. The parties identify only one question specific to the position: a question about past or ongoing issues with District 5's Special Enforcement Team ("SET team"). *Id.* ¶ 31. Lt. Col. Diamond assumed this question suggested there was a problem with District 5's SET team and was designed to elicit how the candidate would change the way the SET team was managed. *Id.* ¶¶ 31, 36.

To prepare for the interview, Lt. Oseman reviewed policies she believed would be applicable to the interview, reviewed the statistics for District 5 as compared to other districts, and spoke to people, including the outgoing District 5 Commander, Capt. Kaupas. Def. Facts ¶ 32; Def. Ex. Q at 30–31. She did not speak to any of the decisionmakers about the vacancy. Def. Facts ¶ 33. Oseman believed that although not prohibited by ISP policy, it would have been inappropriate and "brownnosing" to speak to the interviewers. *Id.* ¶ 34; Pl. Resp. to Def. Facts ¶ 34; Pl. Ex. 2 at 32.

For his interview preparation, Lt. Cooke spoke with Chiefs of Police in the District 5 area, State Police Captains in investigations and patrol, ISP employees in technical areas, the regional administrative officer, retired captains who had served in District 5, retired regional commanders, then-Region II Commander Lt. Col. Maton (who also sat on the interview panel), and outgoing District 5 Commander Capt. Kaupas. Def. Facts ¶ 38. Cooke also reviewed information regarding District 5. *Id.* Cooke came to the interview with operational plans, community response strategies, and copies of grants he had worked on in the past. *Id.* ¶ 39.

---

the court assumes the issue of the missing notes was thoroughly explored by the parties, and yet Oseman has not presented any argument about bad faith.

Lt. Col. Diamond recalled that Lt. Oseman had a more comfortable, relaxed demeanor in contrast to Lt. Cooke's more passionate, hungry one. Def. Facts ¶¶ 35, 40. Diamond believed Oseman viewed her promotion as a foregone conclusion. *Id.* ¶ 35; Def. Ex. W at 101–02. When asked about the SET team, Diamond recalled that Oseman would continue to manage the team in the same manner it had been run. Def. Facts ¶ 36. Although Diamond thought Oseman otherwise performed fine in the interview, she viewed Oseman's answer to the SET team question as "a bit of a miss" because Oseman failed to present a plan for the team. *Id.* ¶¶ 35–36. Lt. Col. Haley remembered that Oseman agreed some members of the SET team were not getting along, causing friction, but that she believed the members were getting along better. *Id.* ¶ 37. Haley testified that Cooke suggested more training from investigations for the SET team. *Id.* ¶ 41. He considered this answer better developed than Oseman's. *Id.*

After the interview, the panel determined that both candidates would be rated "highly recommended" and continue to the next step in the promotion process. Def. Facts ¶¶ 42, 44. During the post-interview discussion, a 2008 incident outside the scope of the interview was raised about Oseman. *Id.* ¶ 43; Pl. Facts ¶ 15. Resolving disputes in Oseman's favor, Lt. Col. Keen shared negative information about a communication issue Oseman had with the Division of Internal Investigations. Pl. Ex. 11 at 92–93. Keen described the overall issue and incident. Pl. Facts ¶ 15. But he did not share the circumstances leading up to it. Pl. Ex. 11 at 93. No outside negative information was raised about Cooke.

The 2008 communication incident concerned an email Lt. Oseman sent to an officer in the Division of Internal Investigations ("DII"). Her email to the DII officer stated:

Are you guys wanting to come down to D-5 this year? I had been told you guys

9

were going to D-15. I would prefer DII not work in D-5 this year. It creates extra
work for my court officer, and chaos for the desk operations. Is there any chance
you can work at another facility?

Pl. Ex. 27. This email was forwarded up the chains of command in the Division of Operations and the Division of Internal Investigations, which included Lt. Col. Maton (then Region II Commander), Lt. Col. Keen (whose position then is unclear from the parties' citations), and Col. Harold Nelson (Deputy Director of the Division of Operations). Pl. Facts ¶ 9. Nelson responded to the email, copying Oseman's chain of command, stating:

I think we all know how easy it is to misconstrue an E-mail because unlike face to
face or telephonic communications you can't always discern tone, tenor or
context. That being said, someone will have a huge job in convincing me that
Lt. Oseman meant something other than what's in print!

*Id.* ¶ 10. Nelson was "going to insist and encourage" that if DII or any other ISP Division wanted to assist in a detail, they should conduct the detail in District 5. Pl. Ex. 27. Further, he directed that Oseman personally coordinate necessary detail logistics. *Id.* Capt. Kaupas was part of the email chain and, as District 5 Commander, apologized on behalf of District 5 for not appearing to be a team player. Def. Ex. CC. He promised to speak to Oseman about the situation and what precipitated the email. *Id.*

Capt. Kaupas learned that the year before, in 2007, DII conducted a roadside safety check in District 5. Pl. Facts ¶ 8; Pl. Ex. 24 at ¶ 14; Pl. Ex. 28. A DII officer working the detail created a safety risk by failing to remove his gun before entering the prisoner processing room. Pl. Ex. 24 at ¶ 14; Pl. Ex. 28. A District 5 shift commander addressed this safety issue with DII personnel, leading to a difference of opinion and strained relationships. Pl. Ex. 24 at ¶ 14; Pl. Ex. 28. Oseman wrote the email in 2008 in an attempt to diffuse the strained relationships. Pl.

Ex. 24 at ¶ 14.

Capt. Kaupas tried to explain the email's context to Col. Nelson, but Nelson "did not want to hear it." Pl. Ex. 24 at ¶ 15. Based on 26 years in the ISP, Kaupas deemed Nelson's reaction to the email and Lt. Oseman "very harsh." *Id.* In Oseman's 2008 performance review, Kaupas praised Oseman's reaction to the email incident:

> During the past year Lt. Oseman was criticized for an incident that was characterized in an unfavorable light without all the pertinent information being available. She did not let this situation get to her, rather she gathered herself and took steps to mitigate the misunderstanding and when the next situation arose, she reached out to the other parties and made sure they were advised of the opportunities to work in the district.

Pl. Facts ¶ 16.

After the interview process, Lt. Oseman and Lt. Cooke proceeded to the selection process. Under the written promotion procedures, the second-level supervisor selects one of the highly recommended candidates based upon an independent analysis. Pl. Facts ¶ 5. The second-level supervisor is tasked with gathering information about the candidates, such as reviewing the applicant's personnel file, last two evaluations, prior discipline, and education history; conducting reference checks; contacting past supervisors; and looking at the results of the interview. Def. Resp. to Pl. Facts ¶ 18; Pl. Ex. 7 at 3. Then, the second-level supervisor makes a selection recommendation and forwards the recommendation through the chain of command to the Deputy Director of the Division, here Col. Nelson. Pl. Ex. 7 at 3. If Col. Nelson supports the recommendation, he presents the recommendation to the ISP Director, the final level of approval who determines whether to promote the recommended candidate. Def. Facts ¶ 19. The written promotion procedures allow the second-level supervisor to delegate conducting the reviews and

11

reference checks, but delegation of the selection decision is not permitted. Pl. Ex. 7 at 3.

Lt. Col. Haley, the first-level supervisor, conducted the review of the highly recommended candidates. Pl. Facts ¶ 18. As part of that process, he reviewed each candidate's personnel file and credentials, looked for discipline, and spoke with each candidate's supervisor and others. *Id.* ¶ 19; Def. Facts ¶ 46. He did not identify any discipline for Lt. Cooke. Pl. Facts ¶ 23; Def. Facts ¶ 48. After the review, he made a recommendation. Defendants do not explain why it was proper for Haley to make a recommendation, in contravention of the written promotion procedures. Haley recommended that Cooke be promoted to District 5 Commander. Def. Facts ¶ 49. He testified that Cooke's demeanor, his plans for the district, and his leadership skills in investigations (which requires good judgment in complex situations) led to his recommendation. *Id.* In Haley's recommendation email, he stated that "Senior Command" indicated Lt. Oseman "demonstrated a reluctance to cooperate with another division." Pl. Facts ¶ 7. Haley testified that during the review process, someone (he does not remember who) made him aware of an email from Oseman to a DII officer and gave him a copy of it.[7] *Id.* Haley considered the email in his selection recommendation. *Id.*

The path of Lt. Col. Haley's recommendation up the chain of command is unclear. Defendants contend he made his recommendation to Lt. Col. Diamond. Def. Facts ¶ 49. Lt. Oseman submits Haley made the recommendation to both Diamond and Lt. Col. Keen, citing

---

[7] Defendants dispute that Haley did not remember who gave him the email. Def. Resp. to Pl. Facts ¶ 7. They contend the record cite, Pl. Ex. 5 at 111–17, reveals Region II Staff Officer Pat Callahan and another individual made him aware of the email. The record reveals that Callahan made negative comments about Oseman, but the cited pages do not state what those negative comments were. Pl. Ex. 5 at 111. Later, Haley stated that he did not remember who brought the email to his attention. *Id.* at 113–14.

12

the recommendation email, which was sent to both. Pl. Resp. to Def. Facts ¶¶ 49–50; Pl. Ex. 16. The dispute concerns who were the decisionmakers for the promotion. Haley testified that he presented his recommendation to Diamond. Def. Ex. T at 108. Diamond testified that Keen, as the second-level supervisor, made the recommendation. Pl. Ex. 11 at 73, 83–84. Diamond concurred with recommending Cooke, but if she hadn't, she would not have had the authority to overrule Keen's recommendation. *Id.* at 89–90. She based her concurrence on her observations during the interviews and on the post-interview discussion. *Id.* at 141–43. Although Diamond was likely consulted by Keen about a recommendation, she had no official decisionmaking authority. It is likely that Haley included her in the recommendation email because, as Lieutenant Colonel for Personnel in the Division of Operations, all personnel matters are routed through her to Keen.

Lt. Col. Keen recommended promoting Lt. Cooke to District 5 Commander. Def. Facts ¶ 51. He testified it is important for a district commander to have a demonstrated knowledge in management; excellent verbal communication, written communication, and supervisory skills gained through wide experience; and an extensive awareness of state and federal statutes related to court cases. *Id.* ¶ 52. He recalled that he was impressed with Cooke's background because Cooke branched out from patrol and obtained an extensive background in investigations. *Id.* ¶ 51. Oseman lacked this diversity of experience. Pl. Facts ¶ 26. He noted that all ISP members begin in patrol; however, skills related to budgeting, writing, and knowledge of state and federal statutes are more extensively learned in investigations than patrol. Def. Facts ¶ 53. Those skills are also gained by spending time in different areas rather than one. *Id.* Keen believes it is important for a district commander to have a diverse background because these individuals are

13

later considered for promotion to regional commander, lieutenant colonel, and colonel. *Id.*

The next step up the chain of command was Col. Nelson, Deputy Director of the Division of Operations. Lt. Col. Keen and Lt. Col. Diamond met with Nelson about the promotion. Def. Facts ¶ 55; Pl. Resp. to Def. Facts ¶ 55. Keen presented his recommendation to Nelson, who agreed with it. Pl. Ex. 73, 85–86; Pl. Ex. 13 at 20. None of them had any specific recollection about what was said at the meeting, but Keen guessed he presented each candidate's pluses and minuses. Pl. Ex. 11 at 85; Pl. Ex. 13 at 20–25; Pl. Ex. 3 at 95.

Col. Nelson explicitly denied making the promotion decision based on the 2008 email incident. Pl. Facts ¶ 32. But Capt. Kaupas relates that, in discussing the promotion with Lt. Col. Haley, Haley told him that Nelson "had an issue with promoting Oseman." *Id.* ¶ 12. When Kaupas said it was unfair to use the email as a reason not to promote Oseman, Haley stated he wished he had known about the details of the email so that he could have shared the circumstances with Nelson. *Id.*

Col. Nelson presented the recommendation to ISP Director Jonathon Monken, the final level of approval. Def. Facts ¶ 56. The recommendation was one of dozens presented at a meeting where Lt. Col. Diamond and Lt. Col. Keen were also present. *Id.* ¶¶ 56–57. Monken could not remember what specific comments were made, but he agreed with and approved the promotion of Lt. Cooke to District 5 Commander. *Id.* ¶ 57. The court assumes, for purposes of this motion, that Monken rubberstamped the recommendation. Pl. Resp. to Def. Facts ¶¶ 57–58; Pl. Ex. 4 at 45 (Monken testified he never rejected a promotion recommendation). Cooke was promoted to the rank of captain effective July 1, 2009, and became the full-time District 5 Commander on August 1, 2009. Def. Facts ¶ 59.

14

Throughout the entire promotion process, a documented counseling Lt. Cooke received in October 2008 was never discovered or part of the promotion discussions. Def. Facts ¶ 48; Pl. Facts ¶ 23. An officer under Cooke's supervision was involved in a car accident while driving an ISP-issued car but never completed the required crash report.[8] Pl. Facts ¶¶ 20–21. Cooke was given the documented counseling for "fail[ing] to ensure that proper procedures were followed in accordance with ISP policy EQP-003 that requires the Illinois State Police will investigate all crashes and incidents involving department vehicles." *Id.* ¶ 20. Senior command was disappointed in Cooke for his lack of followup. Pl. Ex. 30.

The documented counseling was made part of Cooke's personnel file. Pl. Facts ¶ 20. In December 2008, Col. Nelson, as Deputy Director of the Division of Operations, requested that Division of Internal Investigations close any investigation into Cooke given that he was issued "summary punishment" by the Division of Operations. *Id.* ¶ 22; Pl. Ex. 31. The parties dispute the significance of a documented counseling. Defendants contend a documented counseling is not considered discipline within the meaning of the ISP collective bargaining agreement. Def. Facts ¶ 48. But the only support for that statement is a citation to a lawyer's statement at a deposition. Def. Ex. Y at 101. Lawyer's statements are not evidence. *Clifford v. Crop Prod. Servs., Inc.*, 627 F.3d 268, 273 n.6 (7th Cir. 2010). Lt. Oseman, on the other hand, cites to Nelson's memorandum describing the documented counseling Cooke received as "summary punishment." Pl. Ex. 31. This is sufficient for the court to assume the documented counseling was summary punishment for purposes of the summary judgment motion.

---

[8] The car accident was actually a hit and run; the officer hit a civilian car and fled the scene. Pl. Facts ¶ 21.

15

Defendants do not explain why the documented counseling was never raised during the promotion decision. The Sworn Promotional Recommendation Form asks for "all incidents of summary punishment" under the heading of "Disciplinary Action." Pl. Ex. 15 at 3. Thus, Lt. Col. Haley's review of Lt. Cooke's personnel file should have uncovered the documented counseling, and the documented counseling should have been disclosed on the form.

Instead of explaining the omission of relevant information, defendants contend disclosure of the documented counseling would not have changed the outcome; Lt. Cooke would still have been promoted. Def. Facts ¶ 60. But Lt. Oseman points out that Col. Nelson testified that if Cooke knew about the crash and did not follow up on the report, it would be cause for concern. Pl. Ex. 13 at 63. It would not have precluded him from serving as district commander, but it would have been discussed. Pl. Ex. 13 at 63–64. ISP Director Monken, Lt. Col. Diamond, Lt. Col. Keen, and Capt. Jansky all believe the documented counseling, although not dispositive, would have been relevant to the promotion decision. Pl. Resp. to Def. Facts ¶ 60; Pl. Facts ¶ 24; Pl. Ex. 4 at 101–02, 164–65.

Lt. Oseman filed a complaint of gender discrimination with ISP's EEO office on July 1, 2009, soon after she learned she was not promoted. Def. Facts ¶ 61; Pl. Ex. 18. Oseman contends Capt. Cooke learned about the EEO complaint no later than September 23, 2009, and he began retaliating against her because of the complaint. Def. Facts ¶ 69; Pl. Resp. to Def. Facts ¶ 69. The EEO investigation was closed in May 2010 without a finding that Oseman's allegations were substantiated. Def. Facts ¶ 68; Def. Ex. L. Oseman later retired.

Lt. Oseman also filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") on December 22, 2009. Pl. Facts ¶ 39. After that investigation concluded, she

16